TAYLOR et al. v. WALKER et al.

(Circuit Court, N. D. Illinois, N. D. May 3, 1902.)

1. CORPORATIONS—LIABILITY OF STOCKHOLDERS—EXCHANGE OF PROPERTY FOR STOCK.

To render the organizers of a corporation, who caused its stock to be issued to themselves in exchange for property which they conveyed to the corporation, liable to its creditors for the difference between the value of the property and the nominal value of the stock, it must be shown that such property was taken in payment for the stock at a large overvaluation, fraudulently, with intent to cheat and defraud those who might become creditors of the corporation, and also that the creditors became such on the faith that its stock was paid up.

2. SAME—PRESUMPTION OF FRAUD—GROSS OVERVALUATION.

Gross overvaluation of property conveyed to a corporation in payment for its stock is presumptive evidence of fraud, which places the burden of proof upon the stockholder to show the good faith of the transaction.

3. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* sufficient to show that the members of a mercantile partnership who organized a corporation to which they transferred the assets of the firm at a gross overvaluation in exchange for its stock acted in good faith and without intent to defraud those who should become creditors of the corporation; being misled as to the actual value of the firm's assets above its liabilities by a statement made from the books, owing to the system of bookkeeping used, of which they had no personal knowledge.

In Equity. Bill filed by judgment creditors against stockholders of James H. Walker Company to enforce unpaid stock liability. On exceptions to master's report, which found that the property exchanged by defendants for their stock was grossly overvalued, but that defendants acted in good faith and without fraudulent intent.

The following is the opinion of the lower court on demurrer to the bill:

"Within the decision of Coit v. Amalgamating Co., 119 U. S. 343, 7 Sup. Ct. 231, 30 L. Ed. 420, and Bank v. Alden, 129 U. S. 372, 9 Sup. Ct. 332, 32 L. Ed. 725, I am constrained to sustain the demurrer to the bill. I think it should be averred that the assets of the James H. Walker Company were taken in payment of stock in the corporation at a large overvaluation, fraudulently, with intent to cheat and defraud those who might intend to become creditors of the said corporation. And I think it should also be averred that the creditor became such in the faith that the stock had been fully paid up. It is true that a gross and obvious overvaluation of property conveyed to a corporation in consideration of an issue of stock at a valuation is strong evidence of fraud, and possibly, if the fact should turn out to be as stated in this bill, the valuation here asserted would, as a matter of law, be conclusively presumed to be fraudulent as against creditors giving credit on the faith of a supposed full payment of stock, but I think that the fraudulent

¶ 1. Acts of corporators and promoters, see note to Yeiser v. Paper Co., 46 C. C. A. 576.

See Corporations, vol. 12, Cent. Dig. §§ 883, 884.

intent and purpose should be specifically charged in the bill, with all apt allegations. In this respect the bill seems to be indefinite."

After the bill had been amended, the defendants again demurred, which demurrer was overruled in the following opinion:

"The bill charges, substantially, that the firm of James H. Walker & Co. in December, 1892, was heavily in debt, its stock of dry goods on hand, old and unsalable, being the accumulation of years, and that it had several hundred thousand dollars of old and worthless accounts appearing upon its books; that the total assets of the said firm did not exceed $2,700,000, and its liabilities exceeded $1,800,000, and that the amount of the property of the firm, over and above the indebtedness, did not, under any circumstances, exceed $900,000; that thereupon, in fear of approaching insolvency, and with a view to relieve the members of the firm from present personal liability and from future liability for debts thereafter to be contracted, in the business, the James H. Walker Company was organized as a corporation by the members of the firm of James H. Walker & Co., with a capital stock of $1,500,000, divided into fifteen thousand shares, of $100 each, all of which stock was subscribed for by Cummings, Howard, and Walker, who composed the firm of James H. Walker & Co., except that 535 shares were subscribed for by James H. Walker, Jr., who refused to accept the shares, which were afterward canceled and reissued to William B. Howard. Cummings, William B. Howard, James H. Walker, Mason, and Willits constituted the first board of directors. The firm of James H. Walker & Co. on the 27th day of December, 1892, proposed to the corporation to sell and convey to it all the assets of the firm for the sum of $1,500,000; the corporation assuming the outstanding liabilities of James H. Walker & Co. The proposition asserted that the assets exceeded the liabilities by that sum. The directors of the corporation, at a meeting held the day of the date of the proposition, passed resolutions reciting the proposal of the firm; that a full examination of the books, accounts, and business of James H. Walker & Co. had been made by the board and by experts and disinterested parties, by which it appeared that the assets exceeded the liabilities of the firm by the sum of $1,500,000,—and thereupon accepted the proposition of the firm. On the same day a resolution was passed that the subscribers to the capital stock be called upon to pay in full their respective subscriptions. It will thus appear that Cummings, Howard, and Walker substantially undertook to and did sell to themselves (they owning practically all of the stock of the corporation) the assets of James H. Walker & Co. No cash was paid in upon the subscriptions, but the stock of Walker & Co. was in fact taken as in payment of the subscription. The bill charges that that stock did not exceed in value, over and above the liabilities of the firm, the sum of $900,000, and that the scheme was a fraudulent device upon the part of the members of the firm of James H. Walker & Co. to relieve themselves from present liability, and to launch this corporation with a pretended stock of $1,500,000, when in fact but $900,000 had been paid, and so to defraud those who might be creditors of the corporation. The complainants assert that they became creditors in the faith that the stock of the corporation had been fully paid up. Of course, if there was a mere honest dispute or difference of opinion with respect to the value of the property acquired, and the corporation had acted in good faith in thus accepting the assets of the firm, a court of chancery could not undertake to make a different bargain for the corporation than it made for itself. But this is not the case presented by the bill. The case made, if the facts charged should turn out to be truly stated, is that the members of the firm of James H. Walker & Co. substantially contracted with themselves to place this business in the name of a corporation to relieve themselves from personal liability, and to palm off upon the corporation a stock of goods at the price of a million and a half dollars that was in fact an old and unsalable stock, not worth to exceed $900,000, in full payment of a stock subscription of a million and a half dollars. And this is charged to have been done fraudulently, with a view to obtain credit in the future and save themselves from liability for the debts incurred. If these charges should prove to be true, within the

decisions of Colt v. Amalgamating Co., 119 U. S. 343, 7 Sup. Ct. 231, 30 L. Ed. 420, Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476, 35 L. Ed. 104, and Lloyd v. Preston, 146 U. S. 630, 13 Sup. Ct. 131, 36 L. Ed. 1111, the bill can be sustained as against Cummings, William B. Howard, James H. Walker, Mason, and Willits."

George B. Wells, for complainant.

Moses, Rosenthal & Kennedy and N. A. Partridge, for intervening petitioners.

John S. Miller, for Mr. Walker.

S. A. Lynde, for estate of C. R. Cummings.

John C. Howard, for estate of William B. Howard.

JENKINS, Circuit Judge. I adhere to the opinion, expressed in the opinion sustaining the demurrer to the original bill, and filed June 19, 1895, that, within the decisions of the supreme court therein referred to, a suit by the complainants can only be sustained upon the ground that the assets of the firm of James H. Walker & Co. were taken in payment of the stock in the corporation at a large overvaluation, fraudulently, and with the intent to cheat and defraud those who might become creditors of the corporation. I am also of the opinion that a gross and obvious overvaluation of property conveyed to the corporation in consideration of an issue of stock is presumptive evidence of fraud, requiring the stockholders charged to show that the transaction was in good faith. I have carefully scrutinized the evidence and the arguments of counsel, and am constrained to the conclusion that the finding of the master must be sustained. It is not necessary, if time served for that purpose, to enter into a critical examination of the evidence. The summing up of the whole matter is well stated by the master, and there is really nothing to be added to his lucid exposition of the facts. In a general way, I may say that the overvaluation of the assets of the firm taken for the stock is gross, in my judgment, and called for an explanation by the defendants. But I think that explanation is forthcoming. Cummings and Howard were special partners in the firm, interested to the extent of $900,000, against the capital supposed to have been contributed by Walker to the amount of $200,000. Mr. Walker was a merchant with a high reputation for ability. The firm conducted a large wholesale business, and also a retail business, in the city of Chicago. In considering the question of good faith, we are to look at the value of assets, not as determined at the end of the great panic of 1893, but as it appeared in the fall of 1892. There is no evidence that either of them anticipated a panic which certainly took the world by surprise. The theory of the complainants is that this corporation was organized in December, 1892, with a view to shield the partners from personal liability for the debt, anticipating the panic, and with knowledge of the coming insolvency of the copartnership. With respect to this it is to be said that neither Cummings nor Howard could possibly profit by such a transaction, as neither of them was personally liable for the debts of the copartnership. Mr. Howard was in ill health, and had shortly before returned from Europe. It would seem that prior to his visit to Europe the formation of the corporation had been sug-

gested by Cummings. Mr. Howard does not seem to have been friendly to the idea until his voyage home, when he met on shipboard and consulted with a large creditor of the firm, who warmly approved the suggestion, and would seem to have converted Mr. Howard to the idea. Mr. Cummings' thought, manifestly, was to infuse young and more active blood into the concern, and also to have more direct control over the business, and that it should not be left wholly within the management of Mr. Walker. Singularly enough, if this were a scheme to defraud, Mr. Walker, the only man personally liable for the debts, was opposed to the corporate scheme, and did not yield to the insistence of his special partners until he had consulted the principal creditors of the firm in New York. I think there is no foundation for the claim that the corporation was formed for the purpose of defrauding the creditors. The corporation had a professed capital stock of $1,500,000, the three partners taking nearly the entire stock. There was no payment of cash by them for the stock taken, but the corporation took the assets of the firm in payment, assuming the liabilities of the firm. It is shown that the estimate of the property was founded upon the statement made by the bookkeeper July 1, 1892, and included an estimate of profit for that year of $100,000 in the wholesale business, which was not realized. An item of $186,000 represented a credit in favor of the wholesale business against the retail department. This latter item represented the value of goods furnished and charged against the retail department, less the amount of sales, but did not represent expenses or losses in the retail business. There was also an item of $101,227.96, which was in fact suspended accounts, probably not of greater value than $25,000. Cummings and Howard knew of the standing of the business only from statements furnished them by the bookkeeper, who seems to have had the exclusive charge of the books, and carried them on upon his own system, which proves to have been erroneous, with reference to arriving at the actual condition of the firm. Indeed, Mr. Walker, while he knew more of the actual management of the business than his special partners, was obliged to place reliance upon the statements furnished by the bookkeeper. We can now see that the bookkeeper should not have included suspended accounts at their face in any statement to show the actual standing of the firm, and should have included losses and expenses, but the question is whether these men were guilty of fraud in accepting in good faith these statements and relying upon them. I do not think they were. A large business was being conducted, and it was but natural that they should, as they must, rely upon statements furnished by their confidential men. As I read the evidence, they had no reason to suppose that the statements contained other than the actual facts with respect to that business, and they had no purpose in creating the corporation, other than to put new life into the business, and to establish a better control over it. The disaster which came about with the panic of 1893 would have resulted if the corporation had not been formed, in which event there would have been no personal liability upon Cummings and Howard, who were the financial support of the concern. Certainly, so far as they are concerned, I can see no object to be at-

tained in perpetrating the supposed fraud upon creditors of the firm. Mr. Walker might have profited by such a scheme, in escaping personal liability, but he was opposed to it, and yielded only to his special partners. And while he doubtless entertained very sanguine views of the business, I do not doubt that he acted in good faith, placing reliance upon the statements of his bookkeeper, the inaccuracies of which resulted from the peculiar method of bookkeeping. These inaccuracies are gross, it is true, but I think the defendants have fully explained how they came about, and have shown their good faith in the matter. They certainly did not anticipate the shipwreck that followed, and, as I think, acted without any purpose of defrauding creditors.

The exceptions to the master's report are overruled, the repo·ι confirmed, and the bill dismissed for want of equity.